UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 22-00060-BAH |
| | ) | |
| VINCENT GILLESPIE | ) | |

### DEFENDANT'S MOTION FOR CHANGE OF VENUE

Vincent Gillespie, through undersigned counsel, and pursuant to Federal Rule of Criminal Procedure 21(a), respectfully requests that this Court transfer the proceedings to the District of Massachusetts, or to any district other than the District of Columbia ("the District") and its immediately neighboring districts.[1]

Gillespie's case is tied to an event so impactful on the psyche of District residents that it is *per se* impossible for local jurors to reach a fair and impartial verdict. District residents have been bombarded with wall-to-wall coverage of the January 6 events, arrests, and related criminal matters. Sections of the District were shut down for a period of weeks as roughly 25,000 National Guard troops roamed the Capitol in armored vehicles or on foot while wearing M-16s.[2] The Mayor of D.C. declared a state of emergency and implemented a 6 p.m. curfew for weeks.[3] Bridges and roads into the District were closed off for a period of time. The Department of Homeland Security declared that government offices were potential targets of "Domestic Violent

---

[1] This motion to transfer venue is based largely on the motion filed in *United States v. Herrera*, 21-cr-619-BAH. The court in that matter denied the motion.

[2] The DCist, *Thousands of National Guard Troops to Remain in DC Through March*, https://dcist.com/story/21/01/23/dc-national-guard-staying-through-march-inauguration-2021/.

[3] Executive Office of the Mayor, *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today

Extremists."[4] Given the nature and circumstances of the allegations against Gillespie, the community impact from January 6th is "so profound and pervasive" that it would be impossible to seat a fair and impartial jury. *See, e.g., United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996); *United States v. Awadallah*, 457 F. Supp. 2d 246 (S.D.N.Y. 2006) (suggesting that had the defendant, who was charged with perjury, actually participated in the 9-11 attacks on New York, "the effects that a massive, disastrous event has wrought on the jury pool" would require a change of venue).

For the reasons that follow, Gillespie's constitutional right to a fair and impartial jury is not something which the District can provide him.

## ARGUMENT

The American legal system "has always endeavored to prevent even the probability of unfairness." *In re Murchison*, 349 U.S. 133, 136 (1955). Both the Fifth and Sixth Amendments secure the right to trial by an impartial jury. Const. amends. V, VI; *see also Skilling v. United States*, 561 U.S. 358, 378 (2010). The importance of an impartial jury is fundamental to due process and, notwithstanding constitutional venue prescriptions, when prejudice makes it such that a defendant cannot obtain a fair and impartial trial in the indicting district, the district court must transfer the proceedings upon the defendant's motion. Fed. R. Crim. P. 21(a); *see also Skilling*, 561 U.S. at 378.

In some instances, a potential jury pool can be determined to be irredeemably biased when the alleged crime results in "effects . . . on [a] community [that] are so profound and pervasive that no detailed discussion of the [pretrial publicity and juror partiality] evidence is

---

[4] National Terrorism Advisory System Bulletin, https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-january-27-2021.

necessary." *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) (summarily finding that a trial of Oklahoma City bombing suspects in federal court in Oklahoma City (Western District of Oklahoma) would be constitutionally unfair). The hostility of the venue community is so severe that it gives rise to a presumption of juror prejudice. *See Patton v. Yount*, 467 U.S. 1025, 1031 (1984). The Court in *Skilling* identified three factors to guide the lower courts in determining whether a presumption of prejudice should attach: (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3) the time between the arrest and trial, as it relates to the attenuation of the media coverage.[5] *Skilling*, 561 U.S. at 378-83.

Where it attaches, the Court has further recognized that the presumption of prejudice overrides juror declarations of impartiality during voir dire because such attestations may be insufficient to protect a defendant's rights in particularly charged cases. *Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *see also Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father."). Indeed, on appeal of a denial of a motion for change of venue, an appellate court need not even examine the voir dire record if it finds that the presumption attached. *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963) ("But we do not hesitate to hold,

---

[5] Though not relevant to the instant motion, the Court identified a fourth factor for consideration on appeal following trial in the contested venue: (4) whether the jury convicted the defendant on all counts or only on a subset of counts. The lack of uniformity in result after denial of a motion to transfer venue, the Court observed, indicates that the jury was impartial and capable of rendering a verdict on the facts presented, rather than preconceived notions of guilt.

without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a [transfer].”). Thus, under this precedent, voir dire is simply not a cure for significant and substantiated due process concerns about the jury pool. Each of those concerns is pressing in this case.

A. **The size and characteristics of the District of Columbia jury pool weigh in favor of finding a presumption of prejudice.**

The foundation for the presumption of prejudice is found in *Rideau*. 373 U.S. at 727. In *Rideau*, the first factor that the Court weighed in favor of a finding of prejudice was that a sizeable portion of the small jury pool—about half, according to the numbers cited in the opinion—had been exposed to prejudicial televised broadcasts about the case. *See Id.* at 724. Even though voir dire revealed that only three jurors had actually seen the broadcasts, the Court found that the share of the pool that was tainted was significant enough to render the defendant presumptively prejudiced. *See Id.*

Because measuring the reach and impact of negative media reporting is difficult, in applying *Rideau*, many courts have focused on population size and diversity as a proxy for the share of the population that was likely impacted. For example, in *Skilling*, the Court observed that while the number of Enron victims in Houston was higher than that of other crimes, it was far from universal, and because Houston is the fourth-largest city in the United States, and is highly diverse, a significant number of prospective jurors would have had no connection to Enron. *Skilling*, 561 U.S. at 358 (“[E]xtensive screening questionnaire and followup [sic] *voir dire* yielded jurors whose links to Enron were either nonexistent or attenuated.”).

In contrast to Houston, the District of Columbia is one of the United States’ smaller metropolises, with a population under 700,000. [6] And the impact of the events of January 6 on

---

[6] *See 2020 Census Data Shows DC's Population Growth Nearly Tripled Compared to Previous*

the residents of the District of Columbia were far more widespread than that of Enron in

Houston, affecting a far greater share of residents than the conduct at issue in *Skilling*.

First, a significant proportion of District of Columbia residents either work for the federal

government themselves or have friends or family who do. Specifically, as of September 2017,

the U.S. Office of Personnel Management reported that there are over 580,000 federal civil

workers and annuitants in the greater Washington, D.C. area (excluding postal workers ***are***

certain other federal employees).[7] Just over 177,000 of those workers and annuitants are within

the District of Columbia itself. *Id*. With a total population of around 690,000, it seems clear that

any given member of the District of Columbia jury pool has a greater likelihood of being closely

connected to the federal government than those in comparable metro areas. In fact, as of 2019,

according to the DC Policy Center, active federal employment (including postal workers)

accounted for over a quarter of all jobs in the District of Columbia.[8] And of course, for each

federal worker, there are many friends and family members who are closely connected to the

federal government by proxy.

Thousands of individuals work for Congress directly and many more residents have

friends and family who do.[9] Another large share are in, or have friends and family in, the many

---

*Decade*, DC.gov (Apr. 26, 2021) (D.C. population recorded by census as 689,545), available at
https://dc.gov/release/2020-census-data-shows-dcs-population-growth-nearly-tripled-compared-previousdecade#:~:text=The%202020%20Census%20reports%20DC's,growth%20rate%20in%20the%20nation.

[7] *Federal Civilian Employment*, OPM (Sept. 2017), available at https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/.

[8] *Trends in Federal Employment in DC*, DC Policy Center (Mar. 28, 2019), available at
https://www.dcpolicycenter.org/wp-content/uploads/3019/03/Fed-jobs-role-in-DC-economy.png.

[9] Statistics current as of 2015 show the size of Congressional staff at over 19,000.
Brookings Institute, *Vital Statistics on Congress*, Chapter 5-1, available at

law enforcement groups who took part in responding to January 6.[10] This means that an

enormous share of District of Columbia residents have significant and unique connections with

individuals or institutions that were affected by January 6. Such connections are not likely to be

present in any other comparable district outside of the Washington, D.C. area. The government

has characterized the events of January 6 as an attack on our elections, government institutions

generally, and democracy as a whole, suggesting that those District of Columbia residents closely

connected to the government are more likely to view themselves as the direct victims of the

events.

Second, even District of Columbia residents that have no direct connection to the

government reported feeling deeply traumatized by the events that took place so close to where

they live and work. For example, one D.C. resident shared in an interview that:

> I have not been able to digest any of the atrocities that took
> place last night here in Washington, D.C., you know, literally
> eight blocks away from my front door[.] I've been having a lot

---

https://www.brookings.edu/multi-chapter-report/vital-statistics-on-congress/.

[10] As reported in the Human Capital Strategic Plan, as of early 2021, 2,250 individuals were employed by the U.S. Capitol Police Force. U.S. Capitol Police, *Human Capital Strategic Plan 2021-2025* at 12 (2020), available at https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/USCP%20Human%20Capital%20Strategic%20Plan%20for%202021-2025.pdf. The Metropolitan Police Force employs 4,400 individuals; the D.C. National Guard consists of 2,700 active members. https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR2020 lowres_a.pdf; *see also* D.C. National Guard, About Us (2020), https://dc.ng.mil/About-Us/. About 140 officers were allegedly injured from the events of January 6. *See* Michael Schmidt*, Officers' Injuries, Including Concussions, Show Scope of Violence at Capitol Riot*, N.Y. Times (July 12, 2021), https://www.nytimes.com/2021/02/11/us/politics/capitol-riot-police-officer- injuries.html. And while not all individuals employed by these agencies reported to the Capitol on January 6, all 9,350 individuals were directly and adversely affected by the January 6 events in the form of increased service demands in the weeks that followed, greatly affecting morale. Indeed, as reported by local media, more than 75 officers left the Capitol Police force in the few months following January 6. *More Than 75 Capitol Police Officers Have Quit Amid Low Morale Since Jan. 6*, The Hill (July 7, 2021), https://thehill.com/policy/national-security/561832-more- than-75-capitol-police-officers-have-quit-amid-low-morale-since.

> of conversations with people this morning .....We're all
> hurting. We're terrified. We're in shock. And I think it's
> going to take a while. This is by far the darkest moment of my
> 45-year existence.[11]

Such accounts are typical of those gathered in interviews in the days following January 6,

during which the mayor declared a state of emergency, implemented a city-wide curfew,

restricted access to particular roads and bridges, and requested that residents not attend the

presidential inauguration.[12] District neighborhoods became occupied by the Metropolitan

Police and over 25,000 military personnel in the weeks that followed.[13] Indeed, a local

subsidiary of National Public Radio reported that:

> Residents have rescheduled medical appointments or switched
> up their bike and run routs to steer clear of downtown D.C. or
> the Capitol complex.  Others say they are avoiding speaking
> Spanish in public or buying items like baseball bats for
> personal protection Some are making plans to leave the city for
> inauguration. And many have feelings of anger, sadness, and
> heightened anticipation for the near future [. . . ] Some
> residents are also worried that a stepped up military and police
> presence in the city may only add to their unease.[14]

---

[11] *D.C. Resident Who Gave BLM Protesters Refuge Condemns 'Atrocities' at U.S. Capitol*, CBC (Jan. 7, 2021), https://www.cbc.ca/radio/asithappens/as-it-happens-thursday- edition-1.5864816/d-c-resident-who-gave-blm-protesters-refuge-condemns-atrocities-at-u-s- capitol-1.5864894.

[12] *Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today*, DC.gov (Jan. 6, 2021), https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm- today; *Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, DC.gov (Jan 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s- order-extending-today%E2%80%99s-public-emergency-15-days-a1; Jane Recker, *DC Mayor Says Americans Should Not Come to Washington for the Inauguration*, Washingtonian (Jan. 11, 2021) (noting the many street closures), https://www.washingtonian.com/2021/01/11/dc-mayor- says-americans-should-not-come-to-washington-for-the-inauguration/.

[13] Ellen Mitchell, *Army: Up to 25,000 National Guard in DC for Biden Inauguration*, The Hill (Jan 15, 2021), https://thehill.com/policy/defense/534497-army-up-to-25000-national- guard-in-dc-for-biden-inauguration/.

[14] Jenny Gathright and Rachel Jurzius, *What It Feels Like to Live Under D.C.'s State of Emergency*, National Public Radio (Jan 13, 2021), https://www.npr.org/local/305/2021/01/13/956424722/what-it- feels-like-to-live-under-d-c-s- state-of-emergency.

Moreover, the effects of these events continue to be felt in the District of Columbia. Indeed, District residents reacted with fear in anticipation of protests intended to show support for individuals detained in connection with prosecutions arising from the events of January 6, even though nine months had since elapsed. For example, the *New York Times* ran a piece regarding the "huge" police response to a small protest[15] and the Associated Press similarly reported, "In Edgy Washington, Police Outnumber Jan 6 Protestors," capturing the District's overall tenor and response to these ongoing demonstrations.[16]

Third, an overwhelming number of District of Columbia residents — over 92 percent — voted for President Biden.[17] According to the government's likely theory of the case, Mr. Gillespie and the others charged in connection with January 6 did what they did to prevent Biden from becoming President notwithstanding his share of the electoral and popular vote. That is, the government's likely theory is that Gillespie and others were seeking to nullify the votes of an overwhelming majority of District of Columbia residents—in the only national election in which District residents have any say, given their lack of representation in Congress. *See, e.g.*, *Castanon v. United States*, 444 F. Supp. 3d 118, 139 (D.D.C. 2020) ("Article I contemplates that only 'residents of actual states' have and may exercise the House

---

[15] Jonathan Weisman and Matthew Rosenberg, *Sparse Right-Wing Protest of Jan. 6 Arrests Draws Huge Police Response*, N.Y. Times (Sept. 18, 2021; updated October 18, 2021), https://www.nytimes.com/2021/09/18/us/politics/capitol-sept-18-rally.html.

[16] Associated Press, *In Edgy Washington, Police Outnumber Jan. 6 Protesters*, US News (Sept. 18, 2021), https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rally-supporting-jan-6-rioters.

[17] *General Election 2020: Certified Results*, DC Board of Elections (Dec. 2, 2020), https://electionresults.dcboe.org/election_results/2020-General-Election.

franchise") (citing *Adams v. Clinton*, 90 F. Supp. 2d 35, 47 (D.D.C.), *aff'd sub nom. Alexander v. Mineta*, 531 U.S. 940 (2000)), *reconsideration denied*, No. CV 18-2545, 2020 WL 5569943 (D.D.C. Sept. 16, 2020), *aff'd*, No. 20-1279, 2021 WL 4507556 (U.S. Oct. 4, 2021).

Fourth, the government, the media, and judicial officers speak of these prosecutions as designed to prevent "another January 6," and District of Columbia residents know that a repeat of January 6 can only take place in their home.[18] As such, the residents of the District sitting as jurors are highly likely to view Gillespie not only as someone who victimized them, but also as someone who might victimize them again in the future[19], raising a concern about punishing for propensity.

Given the electoral makeup of the District, it would be impossible to empanel a jury that does not consist of people that the government charges were the targets of Gillespie's alleged offenses. Thus, though significantly more populous than the pool in *Rideau*, Gillespie submits that the impact of the events of January 6 was felt by a far greater proportion of the residents and felt much more personally and viscerally. The events of January rendered those residents—and therefore the jury pool—neither impartial nor indifferent.

---

[18] *See, e.g.*, Zachary B. Wolf, *These Republicans Are Worried About Trump's Attempted Coup 2.0*, CNN (Nov. 5, 2021) https://www.cnn.com/2021/11/05/politics/january-6-insurrection-trump-documentary-what-matters/index.html; *see also* Jordan Fischer et. al, *Judge Skewers DOJ at January 6 Sentencing*, WUSA9 (Oct. 28, 2021) (stating that a district court judge imposed a sentence designed to alert "others who might consider attacking the Capitol" that "their punishment would 'hurt.'"), https://www.wusa9.com/article/news/national/capitol-riots/resolving-the-crime-of-the-century-with-misdemeanors-judge-skewers-doj-at-january-6-sentencing-beryl-howell-jack-griffith-anna-morgan-lloyd/65-352274e8-7279-4792-a878-cf4cb0cc20ae.

[19] Gillespie and those charged in conjunction with the January 6 event have been repeatedly (and inaccurately) referred to as "anti-Government militants" or members of anti-Government "militias." Officials have issued "domestic terrorism" alarms and bulletins for the District in light of the Capitol incursion. A district jury would likely be filled with jurors predisposed to convict Gillespie based on the belief that he poses a danger to government employees in general, regardless of the facts presented in court.**[ Cite]**

Finally, data confirms significant majorities of potential jurors in the District of Columbia share materially prejudiced views of January 6 defendants. According to a study conducted by Select Litigation and commissioned by the Public Defender for the District of Columbia to survey the District of Columbia jury pool, 84% have unfavorable opinions about those arrested for participating in the January 6 demonstrations, 62% would characterize these individuals as criminals and 71% have already formed the opinion that these individuals are guilty. *Select Litigation Jury Pool Study*, ¶¶ 9-10, 14, attached to this motion as Exhibit A. Less than 67% of potential DC jurors stated that they believe that they themselves would receive a fair trial if they were defendants in a January 6 case. Ex. 1 ¶ 8.

To prove that Gillespie "corruptly" obstructed an official proceeding under 18 U.S.C. § 1512 (c)(2) as charged, the government must at least prove that a defendant acted with the specific intent to obstruct a Congressional proceeding (the counting of electoral votes, in the government's theory). Unfortunately, the survey data reveals that overwhelming majorities of potential DC jurors have concluded that these defendants' actions would be described as insurrection (76%) and that they were trying to overthrow the US government (72%). Ex. 1. ¶ 15. Not only have most DC residents reached the broader conclusion that these individuals are "guilty," but the vast majority are prejudged to an element that is essential to charges in the case.

This is just the sort of pernicious bias that a typical *voir dire* would not reveal, as *voir dire* usually does not entail inquiring into jurors' ideas about each and  every element of charged offenses. And asking jurors to state whether they have reached conclusions that they cannot set aside during the trial will not reveal such prejudgment: jurors do not always understand which of their opinions are relevant, and what they cannot take for granted without proof beyond a reasonable doubt. *See United States v. Tsarnaev*, 968 F.3d 24, 58 (1st Cir. 2020), *rev'd on other*

*grounds*, 142 S. Ct. 1024 (2022) (discussing juror unawareness of bias) (*citing Smith v. Phillips*, 455 U.S. 209, 221-22 (1982)). The evidence that the data reveals is in direct conflict with Gillespie's presumption of innocence and his right to an impartial jury.

**B. The nature and volume of national and local media coverage weigh in favor of finding that there is a presumption of prejudice because of greater saturation and impact at the local level.**

Where pervasive pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting . . . [such] that a defendant cannot possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding. *United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due [P]rocess requires that the accused receive a trial by an impartial jury free from outside influences."). This is especially true where publicity is both extensive and sensational in nature. *Quiles-Olivo*, 684 F.3d at 182. That said, observing that "prominence does not necessarily produce prejudice, and juror impartiality does not require ignorance," the Supreme Court has repeatedly rejected claims of prejudice that rely exclusively on negative but dispassionate media reporting. *Skilling*, 561 U.S. at 358 (citing *Irvin*, 366 U.S. at 722).

Something more, such as charged rhetoric or the reporting of gruesome details, is needed to establish prejudice. *See id*. (rejecting the argument that media coverage was prejudicial where "media coverage, on the whole, had been objective and unemotional, and the facts of the case were neither heinous nor sensational."). The Supreme Court has recognized that "something more" exists when the media coverage is particularly inflammatory, and where it pervades the court proceedings. *See Murphy*, 421 U.S. at 799 (1975) ("In those cases the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings"); *see also id.* ("[P]roceedings in these cases were entirely lacking in

the solemnity and sobriety to which a defendant is entitled"). Finally, the problematic media must either be local in distribution, or must have greater local saturation or impact than in other districts; otherwise, there is no disparate prejudicial effect between different (comparable) venues.

For example, in *Skilling*, the defendant cited to hundreds of media reports about the Enron scandal in his motion for a transfer of venue. 561 U.S. at 358. He argued that as the former Chief Executive Officer, such articles necessarily implicated him by proxy, if not directly. *See Id*. The Court disagreed, referencing its earlier opinions concerning the modern ubiquity of news media, and reiterating its former conclusion that volume does not, on its own, create prejudice. *See Id*. at 382. Rather, it is sensationalism of the type that would be easily remembered—not an objective reporting of the facts— that was found to be prejudicial in prior cases before the Court.[20] *Id*. at 381. The Court observed that the stories that *Skilling* cited about Enron contained "no confessions, no blatantly prejudicial information," and were "largely objective and unemotional." *Id*. at 370-71, 382 (observing that none of the reports "invited prejudgment of his culpability"). As such, the Court held that it was inappropriate to apply a broad presumption of prejudice.

Here, in a city still feeling the impacts of January 6, the pre-trial publicity—both national and local—has only served to enhance and sustain the effects and by extension, sentiments about the participants. The volume, depth of coverage, and duration of the reporting about January 6 has been almost entirely unprecedented, perhaps only comparable to the

---

[20] Of course, as the concurrence in part pointed out, voir dire later revealed that these "objective" media reports had indeed created a bias among many potential jurors, and that the district court failed to properly vet their assurances of impartiality after those biases were revealed. *See id*. at 427 (Sotomayor, J., concurring in part).

reporting following September 11.[21]  It has also been sensational, including the repeated

showing of select snippets of photographic and video footage appearing to show the destruction

of the Capitol property and officers in distress. Indeed, some of these officers have testified

before Congress about their experiences that may or may not have been representative of the

whole—testimony that was also widely circulated in print and through video.[22]

        The language used in the public realm to describe the events of January 6 and of the

defendants involved in those events has been especially charged and inflammatory. For

example, in late January, President Biden referred to those involved in the January 6 events as

"a group of thugs, insurrectionists, political extremists, and white supremacists."[23] Similarly,

representative Cori Bush called the January 6 incident "a white supremacist insurrection" and a

"domestic terror attack."[24] The coverage of the scene itself has also been sensationalist, relying

on gruesome details in click-bait headlines to galvanize the public. For example, a video

released on CNN began:

> Hours after the rioters has been pushed back from the
> Capitol, when there was still glass on the stairs and blood on

---

[21] "Nearly seven-in-ten adults (69%) say they have heard 'a lot' about the rioting at the U.S. Capitol on Jan. 6." *Views on the Rioting at the US Capitol*, Pew Research Center (Jan. 15, 2021), https://www.pewresearch.org/politics/2021/01/15/views-on-the-rioting-at-the-u-s-capitol/ *compare with The War On Terrorism*, Pew Research Center (May 23, 2002), https://www.pewresearch.org/journalism/2002/05/23/the-war-on-terrorism/ (noting increase in network news consumption of 7 to 10 percent in the weeks following the September 11 attacks).

[22] *See, e.g.*, *Police Officers Deliver Emotional Testimony About Violent Day at the Capitol*, Washington Post (July 27, 2021), https://www.washingtonpost.com/politics/2021/07/27/jan-6-commission-hearing-live-updates/.

[23] *Remarks by President Biden at Signing of an Executive Order on Racial Equity*, The White House (2021), https://www.whitehouse.gov/briefing-room/speeches- remarks/2021/01/26/remarks-by-president-biden-at-signing-of-an-executive-order-on-racial- equity/.

[24] *Rep. Cori Bush Calls Trump 'White Supremacist-in-Chief'*, NBC4 Washington (Jan. 13, 2021), https://www.nbcwashington.com/news/national-international/rep-cori-bush-calls- trump- white-supremacist-in-chief/2540892/.

> the floors, Congress tried to get back to the business of
> democracy . . .[25]

This is hardly comparable to the "unemotional" reporting on Enron's collapse and the white-collar crime allegations against its management as described by the Court in *Skilling*. 561 U.S. at 371-72, 382.

Additionally, much of the early reporting has since been shown to be factually inaccurate. For example, immediately following the events of January 6, President Biden, among other high- profile individuals, claimed that January 6 protestors killed Officer Brian Sicknick, and he repeated the claim months after it became clear that there was no basis for it.[26] Even the official press release stated that:

> Officer Brian D. Sicknick passed away due to injuries
> sustained while on-duty. Officer Sicknick was responding
> to the riots on Wednesday, January 6, 2021, at the U.S. Capitol
> and was injured while physically engaging with protesters.[27]

These claims were widely circulated and did reputational damage to defendants before the medical examiner quietly reported—more than four months later—that Officer Sicknick died of two strokes, and that he sustained no internal or external injuries from his exposure to chemical spray on January 6.[28]

---

[25] Zachary B. Wolf, *These Republicans Are Worried About Trump's Attempted Coup 2.0*, CNN (Nov. 5, 2021), https://www.cnn.com/2021/11/05/politics/january-6-insurrection-trump- documentary-what-matters/index.html.

[26] Christian Datoc and Jerry Dunleavy, *Biden Claims Jan. 6 Rioters Killed Capitol Police Officer Brian Sicknick*, Washington Examiner (June 17, 2021), available at https://www.yahoo.com/now/biden-claims-jan-6-rioters-161300824.html.

[27] *Press Release: Loss of USCP Officer Brian Sicknick*, United States Capitol Police (Jan. 7, 2021), https://www.uscp.gov/media-center/press-releases/loss-uscp-colleague-brian-d- sicknick.

[28] Peter Hermann and Spencer S. Hsu, *Capitol Police Officer Died of Natural Causes, Officials Say*, Washington Post (Apr. 19, 2021), https://www.washingtonpost.com/local/public- safety/brian-sicknick-death-strokes/2021/04/19/36d2d310-617e-11eb-afbe- 9a11a127d146_story.html.

The saturation of this charged and inflammatory reporting in the District of Columbia is so substantial that it would be surprising to identify any potential jurors who have not been exposed to the coverage. And although some in the jury pool may not have heard of Gillespie specifically, his presence at the Capitol that day will necessarily cause prospective jurors to link his conduct to the January 6 reporting generally. And as the Court found in *Rideau*, "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." 373 U.S. at 726.

Finally, the media has reported comments by judicial officers in the District of Columbia regarding the events of January 6, which is particularly impactful given the deference and respect the public affords judges and the fact that those judges will preside over January 6 trials. For example, one article reported on the Court's comments that "*everyone* participating in the mob contributed to [the January 6] violence," and that "[m]embers of a mob who breach barriers and push back officers to disrupt the joint session of Congress are not trespassers, they are criminals."[29] Given their broad framing, prospective jurors would necessarily associate the Court's comments about criminality and the promotion of violence with Gillespie, even though he should be presumed innocent and has yet to be tried.

### C.  The timing of the proceedings weighs in favor of finding a presumption of prejudice.

In determining whether any prior prejudice has been mitigated by the passage of time, the Supreme Court has considered the years between the exposure of the offense conduct and

---

[29] *'Almost Schizophrenic': Judge Rips DOJ Approach to Jan. 6 Prosecutions*, Politico (Oct. 28, 2021) (emphasis added), https://www.politico.com/news/2021/10/28/almost- schizophrenic-judge-rips-doj-approach-to-jan-6-prosecutions-517442.

the trial. For example, in *Skilling*, the Court found that because more than four years had passed between the Enron scandal and the defendant's trial, "the decibel level of media attention diminished somewhat in the years following Enron's collapse," and any exposure to the early reporting would have become attenuated. *Skilling*, 561 U.S. at 383.

Here, in the 23 months since January 6, 2021, media reporting about the events of January 6 remains high. This has been especially true in recent weeks, given the high-profile "Oath-keepers" trial that has permeated the news since it's September 27, 2022 start. The tenor of the news coverage remains sensational. There is no reason to think that coverage will wane before Gillespie's December trial, in fact it is more probable that it will continue to increase as trial nears its completion and the jury renders its verdict. It is a safe inference that everyone in the District of Columbia, where the trial is taking place, is exposed to the coverage and re-living the experiences they underwent on January 6, 2021.

Interest in the events of January 6 has been high since that day, and it has not waned in the District of Columbia. As such, the timing of the proceedings weighs in favor of a finding of presumed prejudice.

## **CONCLUSION**

Because each of the *Skilling* factors weighs in favor of finding a presumption of prejudice, Gillespie requests that the Court transfer the case to the District of Massachusetts or to any district other than the District of Columbia and its immediately neighboring district.

Respectfully Submitted,

Vincent Gillespie
By his attorneys,

*/s/ Timothy G. Watkins*
Timothy G. Watkins
Forest O'Neill-Greenberg
Federal Defender Office
51 Sleeper Street, Fifth Floor
Boston, MA 02210
Tel: 617-223-8061

## CERTIFICATE OF SERVICE

I, Timothy G. Watkins, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on November 4, 2022.

*/s/ Timothy G. Watkins*
Timothy G. Watkins